Our next case is FreshHub, Inc. v. Amazon.com, Inc. Counselor Andres, you have reserved three minutes of rebuttal. This is the third time I see you this week. We're becoming old friends. Good morning, Your Honors, and may it please the Court. And that's correct, three minutes. Your Honor, in order to look at whether or not the District Court should deny FreshHub's J. Mull, this Court reviews that under the de novo standard, puts itself in the shoes of the District Court, and tries to determine whether a reasonable jury would come to that conclusion based on the totality of the evidence presented. FreshHub submits that the evidence in this case was overwhelming. We report expert testimony, over 60 exhibits, technical documents, public documents. We put three other engineers, in our case in chief, in deposition. I'm sorry, I don't see how quantity, this is the question of whether, let's just focus on the item point, whether the accused product could, under the claim construction, basically, is it basically no claim construction? Anyway, not on the specific point of dispute, whether the jury had evidence based on the two sides' testimony on that particular element from which they could decide in Amazon's favor. The only evidence that Amazon put forward was the record of Dr. Johnson, and the Court did not give construction of the term item. Did you ask for one? No, the parties put ordinary meaning. Right, so I guess we have a rule, like an almost unavoidable rule,  that the jury decides whether each side's application of that term is reasonable. And why? Tell me if I'm wrong in my understanding. I took it that on this point, Amazon's experts said, they interpret this, and it's a reasonable interpretation to me, as being basically a particular product that is available, not a generic name for a type of product like carrot. The actual testimony of Amazon's expert was a physical product, something you put in a refrigerator and put on a shelf. Right, I got stuck on that for a while, about imagining not just the name for the product carrot as being on the list, but the carrot being on the list, so that one would have to say in a vegetable aisle, I wouldn't call that an aisle, I'd call that a list. I don't think that's a list. But that was the testimony that he gave. And nobody could possibly have understood that. You don't put literally carrots and bananas and broccoli on a list. You put them in the cart. We agree. But that was their position. That's the reason we said there's no support for their expert's position. He also said that the word order, when you say Amazon, put milk on my list. That was not an order. That was just an utterance of words. So the two terms that their expert relied on, order and list, were so far removed from the ordinary meaning that the district court erred when it didn't discount that testimony altogether, because that was the only basis for Amazon's position of non-infringement. In fact, if you look at the actual testimony in cross-examination, we're like the word milk is an item, according to Amazon. It's on their website. It's on their documents. Dr. Strong, who was the chief engineer of this product, testified milk would be an item. So this is about, you know, it's not a typical battle of the experts where they have two reasonable interpretations. Dr. Johnson had to go so far afield that it would be impossible, as you said, Your Honor, that his interpretation could not be possibly read into the claim itself. But the claim says having or identifying an item corresponding to the text, right? So it couldn't be just a word corresponding to the word. And, I mean, corresponding to the text must be doing some work. It must be referring to some kind of object that corresponds to the word for the object. And then that's further bolstered by the way the word item is used in the abstract and then summary and invention. And then there's other parts of the spec that talk about the SKU identifier for a given object. So, you know, it looks like there's a basis for understanding the word item in the context of this patent that has one of the ordinary meanings of item. I guess item can mean, can be defined in different ways. But item can be the actual thing that corresponds to the word for the thing. Well, I mean, if you go to the, you know, there's two parts of the system here. There's the first system and then the peer system. And when it talks about receive via the digitizer, a verbal order comprising at least one item. So the order has an item there. So it gives a very limited interpretation. There's an orderable item that we're talking about. Yes, like add milk to the shopping list. Milk would be the item. And we showed and everyone admitted that does go on the shopping list. That item does go on it. And Dr. Strom said that is the item. Their document said that is the item. You have to give such a tortured construction that in order to get away from that, as Dr. Johnson did, in order to, you know, find non-infringement. And even the district court, in its denial of the JMO, recognized that it is the actual physical product on the list, as Judge Tarantino just mentioned, is not, it would not be physically possible. It makes the claim nonsense. So there's absolutely no support. And that's the only evidence they have, that one witness. And I guess maybe adding an item to the list is the same thing as just reserving the object for purchasing, you know. And so in that way, you're once again kind of referring to some kind of product that you're adding to your electronic shopping cart. Yeah, and milk or carrots or it doesn't matter what you put on it. If you use the Amazon product, you have the box sitting in your home, you say Alexa, add Carnation Instant Milk to the shopping list, it will add Carnation Instant Milk. It will identify that. If you say milk, it will just add milk. So it is something that there is no dispute that those items are added to the list. And I don't know how, the only way you can get outside of infringement on the item in particular is make it, as Dr. Johnson did say, it's a physical item. It's something you put in the refrigerator or on the shelf. That's the only way you can get around that term. This was such overwhelming evidence to show that items are added to the list, even to the point where we had a party in mission, the man who designed the product. I guess if we were to go your way, it seems like the claim would have just said, you know, after converting to text, just add the text to the list. But the claim actually seems to be calling for something in addition to just merely adding the text to the list. It's identifying an item that corresponds to the text and then adding the item to the list. So it feels like there's something, some more work going on inside this claim than merely adding text, any verbalized text to a list. If you read the claim in totality, when you see the first item is used, it's the verbal order comprising at least an item. So you know that the verbal order comprises the item. That's clear. So you're saying something verbally, and that comprises the item. And then you digitize that, and then you add the identified item to the list associated with the user. And then you enable the list, including the identified item, to be displayed to the user. So you have to display the actual item as well on the list that's on the screen. So I don't, any plain reading, ordinary reading of the terms, I think you can't get around the claim language and the evidence in this case. A reasonable jury would not have found non-infringement of that element. And what about, there's another element here, right? Memory? It was not argued to the jury in closing statements. It was never raised by, Dr. Johnson didn't mention it. Dr. Johnson said the memory's there. It came up in post-op. Isn't there a dispute about what there is, whether it's the little device sitting in your home or whether it's a Mac Plus back-end system with which it communicates? If you look at the claim, it has two systems. I'm sorry, but I thought that this was a dispute not about the claim so much as what your infringement allegation was or infringement proof was. The accused products. We spend a lot of time talking about that back-end system. In fact, we're talking about the back-end system than the front-end system. That's objective. There's no possible way you could say we did not accuse that back-end system because that was the evidence we put in. That was part of the trial brief or anything else. That came out of the blue, that we did not accuse the back-end system in comprising the servers. Is there a front-end jury that said otherwise here? No, the claim was taken as a whole. The evidence that went in was first for the actual Alexa device sitting in your home and then the back-end system sitting on the cloud or Amazon's website. Those were very distinct two systems. We spent probably more time talking about the back-end system. We accused the back-end system. We have the evidence. That's objective. How they came out with how the district court found that that was not accused product is a mystery. I have no idea how that came up. It was not argued to the jury. Just real quick, before I get to my rebuttal time, I do want to talk about the two bases for the new trial. One is the great wave evidence. I'm not actually that interested in talking about that, but I am interested in talking about the cross-appeal, if this is the right time or are we going to wait? Can I do that in rebuttal time? No, you better bring it up now so that they have the opportunity to respond to that. They're the moving party. You can address it. Okay, so... On inequitable conduct, and here's my question. In trying to figure out whether there really is only one set of interpretations of what Mr. Weiss and others did here, I would very much like to hear what the non-nefarious scenario is that you think is plausible. So what happened was there was a change in ownership of the parent company, ICANN, and there was a list of patents that were going to be prosecuted, and those were not. And the principal did not get those emails. Mr. Weiss said, you know, he believed it was... Do we have evidence that the principal... Is this Mr. Souter or Sauer or something? Sauer, I believe. Sauer, that he did not get the emails? There's no evidence that he got that. Okay, well, I guess... Fair enough, I asked you a question about give me a scenario in which it's possible that these statements were either... That these statements, there's only one statement at issue, was true or at least not intentionally false. So, okay, so you're describing a scenario... So it's a scenario where there was a list of patents that were sent, and there was no evidence that Mr. Sauer got those patents. He never expressly said, abandoned those patents. When he found out... Are you talking about the assignment right now? No, this was about... There was a list of patents that were going to be dropped on prosecution. There were already some issue patents on those, and there were some that were going to be pursued. You're talking about back during the time where the application, the parent application, received a final office action rejection, and then it was going to go abandoned in six months if it hadn't been responded to. Is that the time frame you're talking about? Yeah, that's correct. Okay. And so there was just no evidence presented, definitely not clear and convincing evidence, that Mr. Sauer saw that information. He expressly said abandoned. That was his intention. When he found out that it was abandoned, he contacted the attorney because there was a change of ownership and there was a fight. There's lawsuits about ownership of the company. So it kind of went to a black hole. And once they realized they revived it, they revived it. There was nothing nefarious that was going on, and that's what the district was going to do. Right. So I think I'm not – you're sort of halfway to what I'm saying. There was a scenario in which – Sauer, was his name? I think that's how you pronounce it. Sauer, and there was another person that Mr. Weiss said he talked to also, I forget his name, that maybe they didn't get the emails in 2012 or 2011, whichever that was. And part of the scenario is that Mr. Weiss would not have followed up on something that I think his deposition has him – in his deposition he said was a pretty big deal and he wouldn't do this without authorization. That's also part of the scenario. Well, it wasn't expressed – part of the scenario was Mr. Weiss had no recollection and no records whether it was an expressed ban or not, and there was nothing in the record to show that it was. So it was never – it was because of the pending lawsuits and the transfer of ownership of the company and who actually got the information, who obtained the information from Mr. Weiss, there was just no evidence that it was a material misrepresentation. There was clearly no intent. There wasn't even close to getting an intent. Mr. Weiss had no intent. Mr. Sauer had no intent. There was nothing – I think I remember that Mr. Weiss said what he – the intent that he thought mattered was Mr. Sauer's intent, not his. That's correct. Right? And on the – on whether the abandonment was intentional, not whether the, by assumption, false assertion to the PTO was intentional. Two different intents floating around here, right? Correct. And so you have to have a plausible scenario in which – and you're really focusing on what happened at the company, not what happened at Kenobi. Your scenario is that the emails kind of got lost or something and that that's plausible even though Mr. Weiss would have been pretty careful about allowing this to go abandoned without an authorization. Well, Mr. Weiss – I know there's no evidence of the authorization. I'm talking about a scenario that is plausible enough that the district court could say that the evidence that there is leaves a plausible alternative and as long as there's a plausible alternative, I can and indeed should reject the inequitable conduct. Correct. And after a thorough bench on this, what the district court found that was the most reasonable inference was there was no intent to cede by the company. Not quite sure he said that. I think he just said that there's no proof that the most reasonable inference is the bad one. Not that. I don't think he found that the most reasonable inference is the alternative. There was no intent to cede. I think we're saying the same thing, but maybe it's just different. Okay. But you just keep saying there was no intent, there was no intent. And just to follow up on Judge Toronto's question, it's hard for us to just simply accept the conclusion without understanding what would the scenario have been, the plausible scenario that occurred at the time between the Kenobi attorney and then the client and how this thing is going to end. And as I understand it, Mr. Weiss said, as a general matter, he wouldn't let something go abandoned unless the client told him it's okay to let this one go abandoned. So that's the question. Did that just not happen here? That he didn't ever get the official sign-off from the client to let it go abandoned? That's what the evidence shows. Well, I mean, the evidence doesn't show anything, I guess, is the problem here. Maybe that's the problem for the other side. We don't know. Well, I'm just trying to figure out maybe the same thing that Judge Toronto's trying to figure out. Is that plausible that a patent attorney, an experienced patent attorney, would just let something go abandoned if he checks in with the client and the client just is radio silent and then six months elapses and now the thing is officially abandoned? I'm not a soothsayer. I can only say what the evidence showed. And so what the evidence showed in this case was that because of the change of ownership in the company, Mr. Sauer being in and being out and lawsuits being filed, email went to a black hole, and things didn't happen for several years until the company got sorted out. That's what the evidence is in this case. I'm not trying to guess what really happened because I can only live with the evidence that was presented at trial. And the evidence presented at trial is not clear and convincing. There's absolutely no evidence at all. Maybe that's what the panel's having a problem with. There is no evidence at all. And that's more of Amazon's issue than mine. Thank you. Good morning. This is the Court. Dave Hadden for Amazon. Let me start with the Jamal issue. As the Court knows, only in extreme cases can a Jamal be granted for the party that bears a certain proof. And this is not that extreme case. The claim in this case required translating at least a portion of the digitized order to text and then identifying an item corresponding to the text and then adding that identified item to the list. It's undisputed that in the accused shopping list feature, there is no identification of an item corresponding to the text. The system just adds the word the user said to the list. Well, this comes down to which ordinary meaning of item is really the right one to go with. I think it does, in a way, in that item has to be a thing that is distinct from the text. But I think that is clear from the language of the claim itself. You have to have text. Then you have to identify an item corresponding to that text. If the order came in with the text saying, I want, I forget what Mr. Andre's example was, powdered milk and the person puts in the store SKU number, that would presumably come in. Well, that would be text, right? The examples in this case were their expert said, add sad to my shopping list. And the word sad shows up in your shopping list. Or you could say, add unicorns, which is what our expert did, and you get the word unicorn. I'm trying to understand. Suppose I typed in or something, or I guess it's not typed in, but gave a verbal order for SKU 1, 2, 3, 4, 5. Then SKU 1, 4, 5 would go in. But that would just be text. What matters is... So that would not come under this claim? It would not because we have not identified an item from the text. That is just random text. It could be anything you said. It's not random. It's SKU number 1, 2, 3, 4, 5. It is, but it's not interpreted as an identification of an item. That SKU number is meaningless in your shopping list. It's just like the word sad or any other word. Now, there are ordering systems that were accused with respect to the other patents where Amazon does try to find a SKU number that corresponds to the words. But that's not what is done in the shopping list. So the step of taking text and then using it to identify a product, which by a SKU number, for example, like you said, which is what the patent describes, is not done. In the patent, you take those words. You try to match them to a description of items in a database. If you find a match, then you find the SKU number corresponding to that item in the database. And that SKU number is the identifier that would get added. None of that happens in the Amazon shopping list because it's not a mechanism for ordering a product at all. So your evidence about what happens in the accused Amazon system is what? There was testimony from Mr. Love, who was in charge of that feature, who explained how it worked and how it didn't identify. How did it work? I want you to describe it to me. So all it does is it takes the word that the user says, it stores that word in his database, and it shows that word on the list. There's a completely separate system that is used by other Amazon speechless that find items when a user says, instead of add to my list, add to my cart. And those features were accused of infringing the other patent in this case that were also found not infringed and from which there is no appeal. So this shopping list feature is completely separate from the ordering features that you can do with Alexa. It's just a way to capture a user's thoughts. The whole purpose is not to order things on Amazon, but just to have a list that you could use anywhere else. So there is no step to match the words in any way to a product you could buy. And there was testimony from Mr. Love, who's in charge of that feature, about that's how it works. Contrary testimony. I assume that when you talk about putting an item on the list, you mean putting a representation in ASCII that corresponds to the physical thing. Yeah, we don't mean to put an item on the list. So if you say milk, and if you're going to identify an item, if you say, Amazon, add milk to my cart, and you have bought Clover 2% milk and a half gallon in the past, Amazon will add that to your cart. But if you say, add milk to my shopping list, you just get the word milk, or unicorns, or sad, or anything else. There's no mechanism to try to identify an actual item that you could purchase. That is the distinction. And that goes also with this other point, that there's no digitized order. An order in this patent is not the example counsel use, telling your son to take out the trash. An order is a purchase request. If you look at Figure 8, which is the only figure in this patent that describes this voice shopping idea at all, the last step is place order. So when we're talking about order, we're talking about a purchase request in order for an item. But there is no order that is received when someone says, add something to my list. It's not a mechanism for ordering a product at all. Can you comment on the second issue about the memory? Yeah, so this claim requires two computer systems. And Fresha made the strategic choice to accuse only the user device, the Echo, the Fire TV, or the Fire Tablet. And they did that because nobody uses their Fire TV to order products or add to their shopping list, right? So they would have a tough time showing damages. But by accusing the product, they can do it. At trial, didn't the back-end servers come up quite a bit? The back-end servers, they talked about them. But what the jury was instructed, and what was in the final pretrial order, was that the accused products were the user devices, the Echo, Fire Tablet, or the Fire TV. And, of course, those do not include the components on the back-end server. Did they refer to Alexa? They accused those products. Those products can interact with Alexa. But what was accused was the end-user products that interact with Alexa. So those products obviously do not include the servers. And our expert explained that. And their expert admitted on cross they don't include the servers and the non-volatile memories on the servers. So those products themselves do not literally infringe. Why didn't you raise this at trial? We did. We did. He's wrong. It's in our brief. Our experts said it. Their experts said it on cross. That's why Judge Albright addressed it in the J-Mall. There was evidence at trial completely about this. So what I'm sitting here thinking is, I guess I'm thinking, I'm not sure whether the argument here is about insufficiency of evidence or it's about you are bound, you the plaintiff, are bound to something in a pretrial instruction that you didn't object to or bound to something in the pretrial order. Well, I think they were bound to what was in the pretrial order as to what the accused product was. And because that was also what the jury was instructed the accused product was. They can argue about other things. But what they had to show at trial was the accused product they identified in the final pretrial order and that was identified to the jury. That had to meet the elements of the claim and it didn't. So there are three major issues where they didn't meet their burden and we're nowhere near the type of extreme case where J-Mall is appropriate. Particularly in the Fifth Circuit where, as you know, the jury was free to disregard their expert entirely. So they would have no evidence of infringement and that was within the jury's purview. Let me switch. Unless you would like me to address the new trial issues, which you didn't hear about, I'm fine skipping that. Let me go to the inequitable conduct because there are a few things that were said here that were flat out wrong. So Mr. Weiss justified that he received the final rejection. That is something he would forward to his client. Now they withheld those communications as privilege. We don't have an objection. But we do have a privilege log. Right, but we don't have an objection from you on appeal about the claims of privilege. No. You're correct, Your Honor. I'm correct. All I was going to point out is that there are communications in the privilege log from Mr. Weiss to Fresh Hub right after he received the final rejection and he testified he had no reason to believe that the client did not receive that communication and that his practice was to send it. Same thing with the notice of abandonment. Just to clarify, I don't quite remember. The items in the privilege log about communications with, I guess ICANN it was, or ICANN, were about communications that came after the email he sent? Yes. So these communications are limited to this application because that's the only thing they logged. No, I'm asking a question about the precise timing. Yeah, I can give you the timing. I have it here written down. So after the final rejection issued, there's a log entries 91 and 92 that were sent two weeks later, the same month. Those are at 1720 to 21 in the appendix. After the notice of abandonment issued, there are log entries 98 and 99 dated three days after the receipt of that abandonment. Those are at 17021. And then there are communications to Mr. Weiss before the petition to revive in 2017, and those are at 17024. How do we know these communications that occurred are necessarily about this particular application? Because Mr. Weiss testified that he only logged communications that referred to the patents in suit, and this is the only pending application that related to these patents. All of these patents were filed based on the revived application that we're talking about now. So these are only about that application. That's the only thing he logged. That's the only thing he provided to us. Am I understanding the inference that you're asking from that is that the— I'm sorry. That non-receipt, the emails falling into a black hole, is disproved by this. That didn't happen. And more importantly, we know it didn't happen because in December 2012, Mr. Weiss prepared this assignment document that explicitly listed this application as abandoned. Well, not so clearly abandoned. Well, Mr. Weiss admitted that he listed it as abandoned. Well, on the assignment, it says something like abandoned, expired, or something else. Right, or inaccurate. But Mr. Weiss testified— And so therefore, if you're just looking at the face of the assignment, which has assorted application numbers, patent numbers, some of which have this label of, you know, that it's not clear just from the face that this thing was abandoned, this particular application was abandoned. Understood. But Mr. Weiss testified that he listed it and knew it was abandoned when he included it on that assignment document. He knew, but that doesn't necessarily mean the client knew. Understood. But the client received that and signed it in front of a notary. So this black hole notion is wrong. The client received it and signed it in front of a notary. Now, let me switch a little bit, because under FMC and other cases, right, Mr. Weiss's intent is attributable to the client. So regardless, if we look at what Mr. Weiss knew, Mr. Weiss testified that he knew this abandonment was not a mistake. He knew it was intentional. I asked him and he testified in 2017, did you wake up and you didn't wake up and find out this was a mistake? And he said, correct. So Mr. Weiss knew this abandonment was intentional. He also testified that he knew. Well, I think there's knowledge of it being abandoned and there's knowledge of it that the client intended it to be abandoned are two different things. They're closely related, but they're different enough that that difference matters to this case. I understood, but I think the point is, when Mr. Weiss filed the petition to revive, right, the Patent Office said this has been abandoned a long time. We're relying on you that that entire delay was intentional. Unintentional.  And he testified he did nothing to revive it. He testified he knew in 2013 that the patent was abandoned and he did nothing to revive it. He knew in 2014 it was abandoned and did nothing to revive it. He knew in 2015 it was abandoned and did nothing to revive it. And he knew in 2017 that it hadn't been a mistake on his part. How can he truthfully say that that entire delay was unintentional? If you know something is abandoned... Well, on that particular question, I thought he was explicit that he said that he thought the intent for abandonment was not his, but the client's. And he did not know that. Or rather, his knowing that it was abandoned is not the same thing as the client having intentionally done so. But his intent goes to the client under FMC. He knew in that entire period that the patent was abandoned. Does FMC say that when an attorney knows that an application goes abandoned, that necessarily means, translates to the client knowing and intentionally choosing to deliberately allow an application to go abandoned? Is that what FMC says? It doesn't matter whether... Is that what FMC says? FMC says that the intent of... Yes or no, is that what FMC says? I don't know if FMC says explicitly that. What FMC says is that the intent of the applicant's representative matters. Right, so one of the things I said to Mr. Andre is there are two intents floating around here. I think you're talking about the second one. The intent behind the representation to the PTO. Exactly, Your Honor. Not the intent for the abandonment. Exactly, Your Honor. So when he says that this entire delay was unintentional, that is not correct. He knew it was abandoned. He did nothing to revive it. So therefore, whatever that period of delay between 2012 and 2017, it couldn't have been a mistake. He knew it wasn't a mistake. He knew every year it was abandoned, and he did nothing to revive it. That is an intentional act. Okay. Thank you. Thank you. I'm going to ask that you restrict your comments regarding the cross appeal to his arguments. Okay, and just very clear, counsel said I was mistaken that we didn't accuse the Alexa system. That's not correct. It was in the pretrial order. We always put in the fact that we accused the products they sell, which is the Amazon Echo, the Fire TV. We always say that the products we always have include Alexa. And in our pretrial order, we call it the Alexa system. It has to connect to the Alexa system. That's the second end of it. So when we talk in our pretrial order, this is at 16349-350, that the Amazon Echo products include all these different products, and they say they also include Alexa. So I think that's undistuted. With respect to the cross appeal issue, very briefly, there is a two-step issue. The falsity question and then the intent. But the falsity includes a different intent. The falsity includes, since the statement that is supposedly false was a statement about a client's intentional abandonment, and I think as I'm understanding things, the core of your point is that it was not proved by clear and convincing evidence that the client intended the abandonment. That's correct. And nothing in the evidence shows that the patent examiner operated in bad faith. I would like to talk about the new trial, but we didn't talk about it, so I'll expect the court will not bring that up, but I'll make sound papers. Thank you.